UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JORGE ARTURO GONZALES,

    Petitioner,

    v.

D.L. RUNNELS, Warden,

    Respondent.

No. C 03-3116 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. In response to the court's order to show cause, respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged supporting exhibits. Petitioner has responded with a traverse. The case is ready for decision.

## BACKGROUND

The California Court of Appeal summarized the underlying facts as follows:

> The People's principal witness was firearm assault victim Rene Morales, who described the Mission District encounter between appellant and murder victim Nelson Espinoza. Morales testified that he met Espinoza, his friend of eight or nine years, after work on December 5, 1997. It was a Friday and Espinoza had just got paid. The two men met by Espinoza's house near Shotwell and Army Streets in San Francisco, to "go out like we did every Friday."
>
> Morales and Espinoza first went to an El Farolito taqueria at 24th and Alabama Streets. At approximately 7:45 p.m., they went to the El Trebol bar at 22d and Capp Streets, where they drank beer. They left the bar and met their friend Wilbur Vasquez. The trio returned to the El Trebol, where they "drank another beer." A fourth man, Oscar Aranda, joined them at the bar. Shortly after midnight the quartet went to another bar, the El Zarape, where they drank "for quite awhile."
>
> They left the El Zarape at almost 2:00 a.m. on December 6, and went to buy more beer at the Cala Foods market between 23rd and 24th Streets on South Van Ness. Espinoza and Vasquez went into Cala Foods and came out with two 12-packs of beer. The four men stood for a while in the store's parking lot facing Shotwell Street. Espinoza and Vasquez separated from the group to go smoke cigarettes; Morales and Aranda, who did not smoke, started to walk towards 23d Street.
>
> A van passed in front of Morales and Aranda and stopped in front of Espinoza and Vasquez. Appellant and two other men got out of the van.

Appellant asked Espinoza and Vasquez where they were from and what they were doing on 24th Street. Appellant also told the two men "that they were like Surenos," in reference to a street gang. Morales saw Espinoza walk toward appellant, who in turn walked two or three steps toward Espinoza.

As appellant and Espinoza "g[o]t close to each other," appellant pulled a black automatic pistol and pointed it at Espinoza, holding the gun straight out in front of him. Espinoza had not said anything to appellant nor moved his hands in a threatening manner; he approached appellant holding a bottle of beer at chest level. When appellant pulled the gun, Espinoza moved back and raised his arms, and swung at appellant's gun hand in an effort to knock the gun out of appellant's hand. According to Morales, Espinoza did not swing the beer bottle at appellant or raise the bottle over his head.

Appellant lowered his gun arm, straightened it out again, and shot Espinoza in the chest, killing him. Morales told appellant to stop shooting, whereupon appellant pointed the pistol at Morales and Vasquez.

Vasquez essentially corroborated Morales' testimony, although he couldn't identify appellant as the shooter. Vasquez testified that he met Espinoza, Morales and Aranda after work on Friday, December 5, 1997, and joined them at the El Zarape bar. Late that evening the four went to Cala Foods to buy more beer. Vasquez walked out of the store with Espinoza toward Shotwell Street, with Morales and Aranda about six feet behind. A van pulled up in front of Vasquez and Espinoza; one of the passengers got out and urinated in the parking lot.

Espinoza walked toward another passenger of the van, who got out and pulled a black automatic pistol. The passenger pointed the gun at Espinoza, who made two motions with his arms as if to grab the gun or knock it away. The passenger shot Espinoza in the chest, and then ran off down Shotwell Street. Vasquez could not identify the shooter because it was too dark.

An autopsy revealed that Espinoza died from a gunshot wound to the chest which perforated his pulmonary artery and caused massive internal bleeding. Espinoza had a blood alcohol level of .23 or .24, and traces of metabolized cocaine in his system.

Appellant was apprehended after a traffic stop on February 4, 1999, and consented to a search of his house. That search revealed a 9mm Smith & Wesson automatic pistol which Morales identified as being "similar" to the one he saw in appellant's hands the night of the shooting.

Appellant did not testify. Rather, he presented the testimony of Abraham Guerra, a retired airport security guard who lived on Shotwell Street across from the Cala Foods parking lot. Early in the morning of December 6, 1997, Guerra was awakened by the loud talking of four men drinking beer in the parking lot. He sprang to the window to see what was the matter, and saw a van pull into the parking lot and stop about 25 feet from the four revelers. Three men got out of the van. At least two of them urinated in the parking lot.

Guerra saw one of the beer drinkers approach the two urinating men and yell at them to stop. Two more beer drinkers joined the first in cajoling

2

>the two van passengers against the outdoor micturition. The fourth beer drinker approached the third van passenger with a bottle of beer held in his closed right fist. It looked to Guerra like the fourth drinker was trying to grab the third van passenger with his left hand; Guerra though the drinker was going to hit the third passenger with the beer bottle. But Guerra admitted the fourth drinker did not raise the bottle over his head.
>
>Guerra saw the third van passenger step back four steps and pull a gun on the fourth beer drinker. The gunman may have said, "Go, go." The beer drinker stepped toward the gunman and tried, unsuccessfully, to push away his gun hand; he used his left hand, not the hand holding the bottle. As the beer drinker approached the gunman holding the beer bottle at his side, the gunman shot him.
>
>On rebuttal, the parties stipulated that appellant told a police inspector that Espinoza twice tried to push away his gun hand, and that after he fired the shot he picked up the shell casing and ran to his mother's house.
>
>The defense theory was that appellant acted in self-defense, imperfect self-defense, or in the heat of passion or sudden quarrel. The jury was instructed, inter alia, on first and second degree murder, voluntary and involuntary manslaughter, self-defense, imperfect self-defense, and assault with a firearm.
>
>Appellant was acquitted of the first degree murder, but convicted of the second degree murder, of Espinoza. He was also convicted of the firearm assault on Morales. The jury found that appellant personally used a firearm in the commission of both offenses. Appellant was sentenced to 27 years and 4 months to life: 15 years to life for the murder plus the aggravated 10-year consecutive term for the personal use of a firearm, plus a 1-year consecutive sentence for the firearm assault and an additional 16-month consecutive sentence for the personal use of a firearm.

Respondent's Ex. A (Unpublished Opinion of the California Court of Appeal, First Appellate District, *People v. Gonzales*, No. A092988 (Jan. 18, 2002) at 1-4.[1]

Petitioner appealed his conviction to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. Petitioner did not seek direct appellate review in the California Supreme Court. Petitioner filed a petition for writ of habeas corpus in the California Supreme Court which, apparently, was summarily denied.[2]

---

[1] All exhibits referenced in this order are those lodged by respondent in support of the answer to the petition, unless otherwise noted.

[2] Neither petitioner nor respondent has provided a copy of the state court order denying the petition for writ of habeas corpus. However, it is undisputed that petitioner exhausted all of the claims raised in the instant petition by presenting them to the California Supreme Court.

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2001), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Section 2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the petitioner challenges

4

the state court's findings based entirely on the state court record. *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004). The relevant question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

The state court decision to which 2254(d) applies is the "last reasoned decision" of the state court, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

**DISCUSSION**

*A.    Exclusion of Evidence*

*1.    Background*

Petitioner claims that the trial court's exclusion of evidence that prosecution witness Rene Morales had a prior arrest for burglary and may have made false statements under oath concerning the incident violated due process and his right to confrontation.

The California Court of Appeal summarized the facts relevant to this claim as follows:

> During a break in Morales' cross-examination, and outside the presence of the jury, defense counsel told the court he had requested, but not received, a copy of a police report showing that Morales "was arrested for a petty theft" in 1992 – eight years prior to appellant's trial. Counsel stated he wanted to impeach Morales with that misdemeanor arrest pursuant to *People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*). Counsel also suggested the theft incident included a burglary charge of some kind. The People responded that they had not yet been able to locate the police report. The court suggested impeachment would not be proper: "Sounds too remote and too minor to me, [a] petty theft eight years ago . . . ."
>
> The court permitted cross-examination of Morales regarding the prior incident, outside the jury's presence, while the People were searching for the report. Morales recalled "having been arrested for a burglary"; he thought the arrest "was maybe about eight or nine years ago." He said he was arrested

5

"on the street" in San Francisco, because "the police said that somebody had broken a car window and that witnesses had said that two Latino men had done it." He denied breaking into the car. When asked, "Had you taken something out of the car?" He replied, "No. No." He was also asked, "Have you ever been arrested for taking something that did not belong to you?" HE answered, "No, never."

The court ruled "[b]ased on what I've heard there is not enough to cross-examine this witness . . . to impeach him" under *Wheeler*. The court withheld a final ruling until the police report could be located.

The next day, again outside the presence of the jury, the People produced the police report. According to the report, Morales had been arrested for burglary (probably in the second degree) after he was found searching through a large duffle bag on the back seat of the victim's car. Defense counsel renewed his request to impeach, but the court indicated ". . . I still think it falls short of substantial enough impeachment. . . . [¶] The problem I have is that we're going to have a whole side issue as to whether the car was locked, whether he broke in, whether somebody else broke in and then he got into the back. It's exactly the same kind of side issues that [*Wheeler*] says must be avoided in order to keep the focus on the trial, especially if the probative [e]ffect of whatever it was the person's accused of doing falls short of the type of moral turpitude that I think is more geared towards credibility issues, but I'll take a look at the police report."

Later that day, outside the jury's presence, the court indicated it had reviewed the police report and had not changed its view on denying the impeachment request. ". . . I think it is of marginal impeachment [e]ffect. It raises too many issues. It's not clear from the report how it was that Mr. Morales was caught. It doesn't look like he was caught right on the scene but it looks like he was brought back to the scene and was identified by the victim, I think, I can't tell that for sure. And it was consistent with what Mr. Morales said. He said he was brought in because there were two Latin males who were accused of being in the car. But I think that as I said earlier this is of marginal impeachment value and . . . therefore[,] exercising my discretion, we'll not bring the witness back to be cross-examined on this."

Defense counsel then noted it was "an interesting point" whether Morales "in answering the questions that were posed to him regarding this incident would subject himself to a claim of perjury or a misstatement of facts, and I certainly argue that it appears to be the case that he was not in fact forthright and truthful when he testified regarding this incident." Counsel did *not* make a request that he be allowed to impeach Morales for purportedly committing perjury in his cross-examination when he denied taking anything in the car burglary.

Ex. A at 5-6.

On appeal, petitioner argued that under state law the trial court should have allowed Morales to be impeached with his prior arrest and his statements to the court about the arrest, because they evidenced moral turpitude and dishonesty. Petitioner also argued that the trial court's ruling deprived him of his right to present a defense and to impeach and

6

cross-examine the principal prosecution witness against him, in violation of due process and the Sixth Amendment.

Rejecting petitioner's contentions, the court of appeal found that the trial court had properly exercised its discretion under state law when excluding the evidence:

> Here the admission of the impeachment evidence would have required locating the victim of an eight-year-old minor car burglary and producing her in court.  The parties would have then had to wrestle with issues surrounding the definition of burglary, such as whether Morales formed an intent to steal before he purportedly broke into the car – eight years after the fact, when it may well be that Morales did nothing more than come across a vandalized car and rummage in a duffel bag inside.  The evidence would have quickly degenerated into just the sort of "nitpicking war[ ] of attrition condemned by the *Wheeler* court.  The trial court acted well within its discretion in concluding the incident was too minor, too remote, and too tenuous of probative character to warrant admission for impeachment.  [Footnote omitted.]
>
> Appellant in his brief also argues that he should have been able to impeach Morales with evidence that he made false statements when questioned outside the presence of the jury about the prior car incident.  This misstates the trial court record because defense counsel did not make that argument to the court.
>
> In any case appellant had numerous ways to cast doubt on Morales' credibility.  The jury knew he was a friend of Espinoza of long standing, and thus the jury was free to infer a pro-prosecution bias in the trial of his friend's killer.  The jury knew Morales had been drinking fairly heavily on the night of the shooting.  The jury knew that Morales testified under oath that he did not see Espinoza use cocaine that night – but cocaine metabolite was found in Espinoza's blood.  Appellant's multiple avenues of impeachment simply did not lead the jury to reject the core of Morales' testimony.

Ex. A at 7-8.

The court also concluded that no constitutional violation had occurred, because "not every restriction on cross-examination violates the confrontation clause, and this one did not." *Id.* at 7 n.1 (internal citation omitted).

In his federal habeas corpus petition, petitioner argues that the exclusion of the impeachment evidence and the limitation on his right to cross-examination violated due process and his right to confrontation.

*2.   Applicable Federal Law*

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or

7

statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).  "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 126 S. Ct. 1727, 1731 (2006) (internal quotation marks and citations omitted).  This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  *See id.*; *see also Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004) (the Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the due process right to a fair trial and the Sixth Amendment right to present a defense).  The due process and Sixth Amendment limitations on the exclusion of critical corroborative defense evidence are clearly established federal law for purposes of federal habeas corpus review.  *See id.* at 1003.

      The Due Process Clause does not guarantee a defendant the right to present all relevant evidence, *see Montana v. Egelhoff*, 518 U.S. 37, 42 (1996), and due process is not violated unless the exclusion of evidence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," *see id.* at 43 (internal quotation marks and citation omitted).  Similarly, the right to cross-examination is not without limit, and the Sixth Amendment right to present a defense is not violated unless the erroneous restriction on cross-examination had a substantial and injurious effect or influence in determining the jury's verdict.  *See Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (discussing standard on federal habeas corpus review).

      In assessing whether the exclusion of evidence has resulted in a violation of due process or the Sixth Amendment, the court considers the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia*, 360 F.3d at 1004.  "[F]ederal habeas courts must 'determine what weight the various interests will carry when placed on the scales,' and ultimately determine whether the

8

decision of the state court to exclude the evidence in question was reasonable or unreasonable." *Id.* (citation omitted).

### 3.  Analysis

Here, the trial court's exclusion of the evidence of Morales's prior arrest was reasonable. The potential probative value of the evidence was contingent upon the prosecution's ability to persuade the jury that Morales had committed the burglary for which he had been arrested. Because Morales denied this fact, however, in order to do so the prosecution would have had to present the complaining witness to the eight year-old offense or overcome hearsay problems to admissibility of the relevant police report, and also would have had to convince the jury that Morales had committed a burglary by proving the requisite element of intent. Even then, however, the absence of criminal charges having been brought against Morales and the disputed significance of the underlying facts would have diminished the probative weight of the evidence with respect to the jury's assessment of Morales' credibility regarding the night of the shooting. The trial court and the court of appeal reasonably concluded that the collateral issues that would be raised by the prosecution's endeavor, and their impact on the jury's ability to focus on the central issue of the charged offenses, outweighed any probative value the evidence might have had. *See Holmes*, 126 S. Ct. at 1732 ("While the Constitution [ ] prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.").

Moreover, even if the evidence was erroneously excluded, the error was harmless. Morales was a crucial prosecution witness and he was extensively cross-examined by the defense. Notably, petitioner was able to impeach Morales' credibility by calling into question his ability to observe and recall the events on the night of the shooting because of his level of intoxication, RT 457-58; emphasizing his long-term friendship with the victim, a possible source of bias, RT 458; pointing out that Morales' testimony in court that he heard

9

petitioner say something about gangs was inconsistent with his taped statement to police that he heard no such statement, RT 156-60; 464-65; and eliciting testimony from Morales that he did not see the victim ingest cocaine that night, RT 168, which contrasted with the autopsy evidence that the victim had cocaine in his system when he died.  In addition, the prosecution's case was strong.  It was undisputed that petitioner had shot the victim, and Morales' testimony that the victim had not swung at petitioner with a beer bottle was corroborated by another prosecution witness (Vasquez), as well as petitioner's defense witness (Guerra).  In sum, the excluded evidence did not have a substantial and injurious effect or influence in determining the jury's verdict.  *Cf. United States v. Miguel*, 111 F.3d 666, 671-72 (9th Cir. 1997) (when cross-examination on a proper subject is denied, the court should assume that the damaging potential of the cross-examination would be fully realized and then determine whether the error is harmless in light of the importance of the witness' testimony in the entire case, the extent of the cross-examination otherwise permitted, and the overall strength of the prosecution's case).

      The state court's rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, *id.* § 2254(d)(2).  Accordingly, this claim for habeas corpus relief is denied.

B.    *Instructional Error*

    *1.    Background*

      The trial court instructed the jury with CALJIC No. 2.51, the standard instruction on motive, as follows:

> Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty.

RT 497, CT 110.

      On appeal, petitioner argued that the instruction was erroneous on two grounds.

10

First, he argued that the instruction was unsupported by the evidence because, while the prosecution contended that there was evidence that the shooting was a premeditated murder motivated by gang rivalry, RT 447-48, the trial court expressly found that "there is no evidence that the defendant is a gang member out to shoot a rival." RT 448.  He also argued that the instruction was legally insufficient because it permitted the jury to conclude that evidence of motive alone may be sufficient to establish guilt, thereby diluting the prosecution's burden of proof by permitting the jury to convict upon less than proof beyond a reasonable doubt.

>The court of appeal rejected both contentions, finding as follows:
>
>Appellant claims there was no factual basis for the instruction, because the trial court specifically found – despite appellant's reference to "Surenos" – that there was no evidence the shooting was motivated by gang rivalry.  This is beside the point: as the People argued below, there was ample evidence the true motive for the killing was that Espinoza "dissed" appellant by twice trying to push his gun hand away.  There was an ample evidentiary basis for the motive instruction.
>
>Nevertheless, appellant argues the instruction is unconstitutional because it impermissibly lowers the People's burden of proof by failing to state explicitly that motive alone is insufficient by itself to establish guilt. Similar challenges to CALJIC No. 2.51 have been emphatically rejected. (See *People v. Estep* (1996) 42 Cal.App.4th 733, 738-739 (*Estep*); *People v. Wade* (1995) 39 Cal.App.4th 1487, 1497.)  The motive instruction does not deal with the burden of proof, but only "one circumstance in the proof puzzle – motive." (*Estep, supra,* at p. 738.)  It does not dilute the burden of proof, especially where – as here – the jury is properly instructed on reasonable doubt.

Ex. A at 13.

In the instant petition, petitioner challenges the jury instruction on the same grounds he raised in state court.

*2.     Applicable Federal Law*

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147

11

1  (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be
2  established not merely that the instruction is undesirable, erroneous, or even 'universally
3  condemned,' but that it violated some right which was guaranteed to the defendant by the
4  Fourteenth Amendment.") (quoting *Cupp*, 414 U.S. at 146).  The instruction "may not be
5  judged in artificial isolation," but must be considered in the context of the instructions as a
6  whole and the trial record.  *See Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).

7       The Due Process Clause of the Fourteenth Amendment protects the accused
8  against conviction except upon proof beyond a reasonable doubt of every fact necessary to
9  constitute the crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364
10 (1970).  This constitutional principle prohibits the state from using evidentiary presumptions
11 in a jury charge that have the effect of relieving the state of its burden of persuasion beyond
12 a reasonable doubt of every essential element of a crime.  *See Yates v. Evatt*, 500 U.S.
13 391, 400-03 (1991).

14      *3.  Analysis*

15      Petitioner argues that the instruction on motive should not have been given because
16 the only evidence tending to show motive was the testimony which suggested he was a
17 gang member but, because the trial court ruled that it was impermissible for the prosecutor
18 to argue that petitioner was a gang member "out to shoot a rival," there was insufficient
19 evidence to support a motive instruction.  The court of appeal rejected this contention,
20 noting that the prosecutor had also argued that the true motive for the shooting was that the
21 victim had disrespected petitioner, and that ample evidence supported this argument.  The
22 record supports the court of appeal's determination.  Prosecution witnesses Morales and
23 Vasquez and defense witness Guerra all testified that the victim approached petitioner,
24 making motions as if he was attempting to push aside the gun petitioner was pointing at
25 him.  Based on this evidence the prosecutor made the following argument to the jury:

26      The real motive for this case, ladies and gentlemen, the real reason
the defendant murdered Nelson Espinoza is that he got disrespected.
27 Somebody is pushing a gun away from you and he does it twice you shoot
him, you know that victim should have been afraid, he should have run away,
28 based on the defendant's, the victim's actions by pushing that gun away that's

1          the reason he shot him, that's the reason he murdered him.
2    RT 450.
3          The motive instruction was amply supported by the evidence.
4          The instruction also did not relieve the state of its burden of proof. On its face, the instruction does not state that evidence of motive may establish guilt. Rather, it clearly states that while motive may "tend" to establish guilt (and, conversely, the absence of motive may tend to show innocence), motive is not an element of the crime charged. The California courts have consistently found that this language does not diminish the burden of proof. *See People v. Snow*, 30 Cal.4th 43, 98 (2003) ("[I]n fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder."); *People v. Estep*, 42 Cal. App. 4th 733, 738 (1996) (CALJIC No. 2.51 does not concern the standard of proof, but "merely one circumstance in the proof puzzle – motive."); *People v. Wade*, 39 Cal. App. 4th 1487, 1496 (1995) ("[T]he instruction merely uses innocence as a direction signal or compass. It does not tell the jurors they must find innocence, nor does it lighten the prosecution's burden of proof . . .").
         Importantly, the jury here also was instructed with CALJIC No. 2.01, the instruction on circumstantial evidence, which explains that each fact or circumstance (such as motive) essential to establish guilt must be proved beyond a reasonable doubt. RT 492-93. The jury also was instructed with CALJIC No. 2.90, which defines reasonable doubt, RT 500-01, and was instructed on the specific intent requirements for each of the charged offenses, RT 501-11. The jury also was told to consider the instructions as a whole. RT 490.
         As a whole, the instructions clearly informed the jury that, irrespective of whether it found motive, it still had to be convinced that all of the elements of the crimes were proved beyond a reasonable doubt. The motive instruction did not lessen the state's burden of proof, and it is not reasonably likely that the jury applied the motive instruction in a way that violates the Constitution.
         The state court's rejection of petitioner's claim was not contrary to, or an

13

1 unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or
2 based on an unreasonable determination of the facts in light of the evidence presented in
3 the state court proceedings, *id.* § 2254(d)(2).  Accordingly, this claim for habeas corpus
4 relief is denied.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  The clerk of the court shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 7/12/07

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.03\Gonzales3116.HabeasOrder.ECK